**Imogene RUSSELL, Individually and as Independent Administratrix of the Estate of Billy G. Russell, Deceased, Appellant,**

v.

**CITY OF SEYMOUR, Texas et al., Appellees.**

**No. 11–91–055–CV.**

Court of Appeals of Texas, Eastland.

July 23, 1992.

Rehearing Denied Aug. 27, 1992.

Hank Anderson, Anderson & Rodriguez, Wichita Falls, for appellant.

Michael R. Spurgers, Fillmore & Purtle, P.C., Charles Oldham, Oldham & Barnard, Wichita Falls, Lauretta ("Laura") S. Martin, Davis & Davis, P.C., Austin, for appellees.

## OPINION

ARNOT, Justice.

Bill Russell suffered a fatal heart attack. His wife, Imogene Russell, individually, as his survivor, and as administratrix of his estate, sued appellees, the City of Seymour, Seymour/Baylor County Emergency Medical Service, and the Seymour Hospital Authority for negligently refusing to transfer Russell to another hospital in Wichita Falls, 50 miles away, which was better equipped to handle Russell's life-threatening condition. Appellant claims that appellees' refusal resulted in Russell's death. Claiming governmental immunity, appellees moved for summary judgment which the trial court granted. On appeal appellant contends that because "use of a motor vehicle" means "non-use of a motor vehicle," appellees have waived governmental immunity under TEX.CIV.PRAC. & REM.CODE ANN. § 101.021(1)(A) (Vernon 1986) arguing *Robinson v. Central Texas MHMR Center,* 780 S.W.2d 169 (Tex.1989) as authority. We affirm.

On April 25, 1987, Bill Russell suffered a heart attack. Seymour EMS, operated by Emergency Medical Technicians (EMT) personnel, Dorothy Gaston and Merry Crounse, transported Russell to the Seymour Hospital. At the hospital, Russell was treated by Dr. Daniel B. Jackson. After stabilizing Russell's condition and consulting with appellant, Dr. Jackson contacted Dr. Samuel Christopher Waters, a cardiac specialist in Wichita Falls. Dr. Waters agreed that he would receive Russell as a patient if Russell could be quickly transported to Wichita Falls. Bethania Hospital, in Wichita Falls, is about 50 miles from Seymour. Seymour EMS did not transport Russell. Instead, Dr. Jackson instructed Lifeline, an ambulance service in Wichita Falls, to make the transfer. Dr. Jackson anticipated that it would only take an additional 30 to 40 minutes to have Lifeline come to Seymour and transport Russell back to Wichita Falls. However, Lifeline did not arrive until later, and Russell did not arrive at Bethania until 9:25 p.m., some three and one-half hours after he was expected to arrive. Russell was treated at Bethania, but he only survived 5 days after his initial heart attack. Dr. Waters stated that the administration of streptokinase procedure would have increased Russell's chance of survival. This procedure was not available at Seymour Hospital.

Appellant, Russell's widow, alleges that Russell's death was caused by the failure to receive treatment within the "window of opportunity." Appellant argues that the failure to timely receive treatment was caused by appellees' negligent failure to transport Russell to Bethania. Appellant contends that the Seymour EMS refused to transport Russell because of a hospital authority policy that stated that an ambulance could not leave Baylor County without a backup. On the day in question, there was no backup available.

TEX.CIV.PRAC. & REM.COED ANN. § 101.021 (Vernon 1986) provides that a governmental unit in the State is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

(A) the property damage, personal injury, or *death arises from the operation or use of a motor-driven vehicle* or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law. (Emphasis added)

In her petition, appellant alleged that Russell's death was caused by the negligent failure of the appellees to use the EMS ambulance, a motor-driven vehicle. On appeal, appellant complains that governmental immunity is waived pursuant to Section 101.021(1)(A). In *Robinson,* the court held that by the language "use of tangible personal property" in Section 101.-021(2), the legislature meant to include "non-use of tangible personal property." Appellant urges that this holding should also be extended to Section 101.021(1)(A), that is, "use of a motor vehicle" means "non-use of a motor vehicle." Appellant concedes in her brief and at argument that, but for the decision in *Robinson,* her action would be barred by governmental immunity.

We need not consider whether the decision in *Robinson* should be extended to Section 101.021(1)(A).[1] To show that governmental immunity has been waived, appellant must allege facts in her petition that would satisfy a waiver under Section 101.021. Even if we assume that the legislature meant to include "non-use" when it waived immunity as to "use" of a motor vehicle, the summary judgment evidence conclusively precludes recovery on appellant's alleged cause of action.

In her five points of error, appellant urges that the trial court erred in granting the summary judgment. Crucial to each of her five points of error is the proposition that governmental immunity has been waived pursuant to Section 101.021(1)(A) of the Texas Civil Practice and Remedies Code.

1. The *Robinson* court, in holding that "use" also means "non-use", relied upon *Lowe v. Texas Tech University,* 540 S.W.2d 297 (Tex.1976), which held that Lowe's pleadings were sufficient to allege that the State had waived governmental immunity for the misuse of tangible personal property by furnishing an incomplete, therefore defective, football uniform to Lowe which later contributed to his injuries.

In its discussion of Lowe's allegations, the court observed that, since Texas Tech furnished Lowe a football uniform, governmental immunity could have been waived by furnishing (1) defective equipment, or (2) by failing to furnish, "as a part of the uniform furnished," proper protective items. The *Lowe* court, cited *McGuire v. Overton Memorial Hospital,* 514 S.W.2d 79 (Tex.Civ.App.—Tyler 1974), *writ ref'd n.r.e.,* 518 S.W.2d 528 (Tex.1975), and *Mokry v. University of Texas Health Science Center at Dallas,* 529 S.W.2d 802 (Tex.Civ.App.—Dallas 1975, writ ref'd n.r.e.), to support its holding. In *McGuire, Mokry,* and *Lowe,* certain "tangible property" had been furnished and other personal property, related to the property furnished, had not. Indeed, the quote from *Lowe* included in *Robinson* states that the allegation of a "failure to furnish" proper items of personal property "to be used as a part of the *uniform furnished* [Lowe]" satisfies the waiver of immunity provision arising from some condition or use of personal property. (Emphasis added)

In his concurring opinion in *Lowe,* Justice Greenhill discusses the possible ambiguity of the language used by the legislature in the statute waiving governmental immunities. Particularly, Greenhill observed that an argument could be made that the legislature had waived immunity in all tort cases. Such is the effect of appellant's argument in the case before us. Encouraging the legislature to cure this problem in a future session, Greenhill answered his own argument that clearly it was not the legislature's intent to waive immunity in all tort cases:

But if they mean that the Legislature intended for the State to be liable in every tort case in which personal property was either used or not used, then we reach different results. This construction would amount to a general waiver in virtually all tort cases.... I think it is clear that the bill which was finally passed by the Legislature and approved by the Governor did not contain a broad, general waiver of governmental immunity. By its express provisions, it waives immunity only in particular instances.

\* \* \* \* \* \*

Carried to its logical conclusion, as I understand the Court's opinion, it might be construed to find a waiver of immunity because the injury grew out of the nonuse (the removal) of a nondefective knee brace which was furnished; i.e., some condition *or use* [nonuse] of personal property. *I do not think the Legislature intended this general sort of waiver.* (Emphasis added).

When reviewing a summary judgment, this court will adhere to the following standards:

(1) The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law;

(2) In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true; and

(3) Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

See TEX.R.CIV.P. 166a; *Goswami v. Metropolitan Savings and Loan Association*, 751 S.W.2d 487, 491 (Tex.1988); *Nixon v. Mr. Property Management Company, Inc.*, 690 S.W.2d 546, 548–49 (Tex.1985); *City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671 (Tex.1979).

As summary judgment proof, appellees included deposition testimony of Dr. Jackson in which he testified that he ordered Lifeline, and not Seymour EMS, to make the transfer. Appellant argues that her responsive summary judgment evidence raises a fact question as to whether Dr. Jackson ordered Seymour EMS to transport Russell to Bethania, which order appellant claims the Seymour EMS refused.

As summary judgment evidence, appellant offered the following deposition testimony. Appellant, decedent's wife, stated that Dr. Jackson suggested she use Dr. Waters as a cardiologist. After she agreed, he called Dr. Waters. Appellant testified that after the conversation with Dr. Waters, which she did not hear, Dr. Jackson told her that Dr. Waters would be the receiving physician and that Russell needed to be transferred immediately to Bethania. Appellant said that a few minutes later she heard Dr. Jackson tell EMT personnel, Gaston and Crounse, to get the ambulance equipment ready to transfer Russell as soon as possible to Wichita Falls.

Nurse Jenisu Morris testified that head nurse Elizabeth June Hrncirik told her that the Seymour EMS was going to make the transfer. This conversation occurred shortly after Russell was admitted to the Seymour hospital, approximately 5:00 p.m.

Lillie Ondricek, a friend accompanying appellant, testified that she heard Dr. Jackson instruct Gaston and Crounse, "You all get the ambulance ready. We'll transfer Bill to Bethania Hospital." Ondricek said that immediately after he gave these instructions, Dr. Jackson left to call Dr. Waters.

Appellant also argues that the following excerpt from Dr. Jackson's deposition raises a fact question as to whether he had ordered the Seymour EMS to transport Russell to Bethania:

Q: Doctor, from your earlier testimony, I gather that almost from the instant that you first diagnosed him that it became apparent to you that a transfer was going to be needed; is that correct?

A: Yes.

Q: Did you ever ask or request either Dot Gaston or Merry Crounse to make the transfer of Bill Russell to Wichita Falls?

A: I don't specifically recall requesting them, no. I was aware of this transfer situation at the time, but I don't specifically recall requesting them to do that.

Q: Are you telling us that you did not make a request of them or that you simply don't remember?

A: I simply don't remember. I don't remember, but I didn't make a forceful request. I could have required them to go, but—had I been forceful about it, I'm sure.

However, the summary judgment evidence conclusively shows that all of the above discussion about the transfer occurred prior to Dr. Jackson's final decision to use Lifeline. By deposition, Dr. Jackson testified that, after he consulted with Dr. Waters, he decided to use Lifeline and instructed the nurse to call Lifeline and arrange for the transfer. Dr. Jackson testified that he thought Seymour EMS was operating under some restrictions that prevented them from leaving the county.

However, Dr. Jackson stated that his decision to use Lifeline was also based on his opinion that the Seymour EMS staff was not qualified to transport this cardiac patient and that the Seymour EMS ambulance was not equipped to handle the transfer. When asked if he was willing to have Seymour EMS transfer Russell, Dr. Jackson answered, "no." Crounse, the ambulance attendant, clearly stated that Dr. Jackson never requested a transfer in her presence. Gaston, the other ambulance attendant, testified that she never received a doctor's order to transfer. The Seymour EMS records show that the ambulance was released shortly after it delivered Russell to the Seymour Hospital.

Russell urges that the summary judgment evidence establishes that a genuine dispute exists as to whether or not the request was made for a transfer; therefore, having raised a fact issue, a summary judgment should not have been entered against her. We disagree. Assuming, without deciding, that Section 101.021(1)(A) waives immunity in all tort cases for the "non-use" of an available motor vehicle, the evidence conclusively establishes that no official request was made to Seymour EMS to transport Russell. Since no request for transfer was made and since the ambulance cannot transfer a patient without the doctor's permission, appellant cannot show that appellees negligently refused to make the transfer. Although in the early stages of the emergency transfer to Wichita Falls was discussed, the final decision was made by Dr. Jackson who instructed Lifeline to make the transfer. Dr. Jackson's testimony concerning his decision to use Lifeline to make the transfer is uncontroverted.

The judgment of the trial court is affirmed.